McCAULEY, as District Attorney of Milwaukee County, Respondent, v. TROPIC OF CANCER and others, Appellants.*

*April 1—May 20, 1963.*

* Motion for rehearing denied, with $25 costs, on October 4, 1963.

136

For the appellants there was a brief by *David B. Bartell* and *William J. Panagis,* both of Milwaukee, and oral argument by *Mr. Bartell.*

For the respondent the cause was argued by *Richard B. Surges,* assistant district attorney of Milwaukee county, with whom on the brief were *George Thompson,* attorney general, and *William J. McCauley,* district attorney of Milwaukee county.

A brief *amicus curiae* was filed by *Walstead, Anderson, Bylsma & Eisenberg* of Madison, for the Wisconsin Chapter of the American Civil Liberties Union.

FAIRCHILD, J.

### The Statute.

This action was brought under sec. 269.565, Stats., entitled, "Declaratory judgments against obscene matter." The issue is whether the matter complained of is obscene. The word "obscene" is not defined. The statute does provide that,

". . . The dominant effect of the whole of such matter shall be determinative of whether said matter is obscene." [1]

The statute directs the court,

". . . subject to the ordinary rules of evidence in civil actions [to] . . . receive the testimony of experts and evidence as to the literary, cultural or educational character of said matter and as to the manner and form of its production, publication, advertisement, distribution and exhibition. . . ." [2]

Where there is a jury trial and the jury finds the matter obscene, the court is directed to enter a judgment of obscen-

---

[1] Sec. 269.565 (4), Stats.
[2] Sec. 269.565 (4), Stats.

ity unless the finding is contrary to law or to the great weight and clear preponderance of the evidence.[3]

Under certain circumstances, a judgment of obscenity is made admissible in evidence in a criminal prosecution for publication or transfer of obscene matter, or possession thereof for purpose of sale,[4] or in a prosecution for knowing possession of obscene printed matter or other materials.[5]

In *State v. Chobot* [6] we reviewed a conviction of possession of obscene written matter for sale. We there treated the definition of the word "obscene" in our statutes as the equivalent of the definition enunciated by the supreme court of the United States, and often referred to as the *Roth* test.[7] We approved the use of the *Roth* test by the circuit court, sustained its finding that the materials involved were obscene, and decided that as so applied our statute did not offend the state constitutional guaranty of free speech, writing, and publication [8] nor the federal constitutional guaranty of freedom of speech or press against state action.[9]

In the case now before us, the application of our statute dealing with obscene material, of the state constitutional guaranty of free speech, writing, and publication, and of the similar federal constitutional guaranty against state action, respectively, again turns upon the question of what is ob-

[3] Sec. 269.565 (5), Stats.

[4] Sec. 944.21, Stats., also provides for the punishment of other acts. The penalty is a fine of not more than $5,000 or imprisonment for not more than five years, or both.

[5] Sec. 944.22, Stats. The penalty is a fine of not more than $1,000 or imprisonment for not more than one year, or both.

[6] (1960), 12 Wis. (2d) 110, 106 N. W. (2d) 286. Appeal dismissed for want of a substantial federal question, three justices being of the opinion that probable jurisdiction should be noted. (1961), 368 U. S. 15, 82 Sup. Ct. 136, 7 L. Ed. (2d) 85.

[7] *Roth v. United States* (1957), 354 U. S. 476, 77 Sup. Ct. 1304, 1 L. Ed. (2d) 1498.

[8] Sec. 3, art. I, Wis. Const.

[9] First and Fourteenth amendments to the U. S. Const.

scene. We approach that question with the thought that it is desirable that the definition of obscenity be the same for all three purposes. We observe, however, that a state may permit greater freedom of speech and press than the Fourteenth amendment would require, although it may not permit less. We recognize *Roth* and other decisions of the supreme court of the United States as completely binding upon us in determining whether the state violates the Fourteenth amendment in proscribing or suppressing a particular piece of material as obscene. Such decisions are eminent and highly persuasive, but not controlling, authority, on the meaning of the term "obscene" in our own statute,[9a] and on the question of whether the proscription or suppression of a particular piece of material as obscene violates sec. 3, art. I of our state constitution.[10]

We think that although the obscenity issue is critical, and appears to be identical, in all three questions, *i.e.*, applicability of state statute, claim of state constitutional protection, and claim of federal constitutional protection, we must logically determine the state issues first. Thus in a case where all three questions are raised, we necessarily decide all three, including the federal question, in affirming a conviction or other judgment based on a finding of obscenity.

---

[9a] The court of appeals of New York took the position that in construing the New York statute it was not bound by *Roth*. It concluded that the statute applies only to "hard-core pornography." *People v. Richmond County News, Inc.* (1961), 9 N. Y. (2d) 578, 586, 175 N. E. (2d) 681, 685.

[10] "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libel, the truth may be given in evidence, and if it shall appear to the jury that the matter charged as libelous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact."

This was true in *Chobot*. Where, however, we reverse a finding of obscenity, we, logically, have decided only state questions and not the federal, unless we were to say that under the particular circumstances the finding would stand, but for the existence of the Fourteenth amendment.

## *The Roth Test.*

The capsule statement of the *Roth* test of obscenity is as follows: "Whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." [11]

The court equates material which deals with sex in a manner appealing to prurient interest as "material having a tendency to excite lustful thoughts" and quotes a dictionary definition of "prurient" as follows: ". . . Itching; longing; uneasy with desire or longing; of persons, having itching, morbid, or lascivious longings; of desire, curiosity, or propensity, lewd. . . ." [12]

The court approved the standards applied by the trial courts in the cases under review (*Roth* and *Alberts*) [13] although not expressed in the same terms as the capsule statement. In *Roth,* the jury had been instructed: " 'The words "obscene, lewd and lascivious" as used in the law, signify that form of immorality which has relation to sexual impurity and has a tendency to excite lustful *thoughts.*' " (p. 486.) And that " 'The test in each case is the effect of the book, picture or publication considered as a whole, not upon any particular class, but upon all those whom it is likely to reach. In other words, you determine its impact upon the average person in the community. The books, pictures and circulars must be judged as a whole, in their

[11] *Roth v. United States, supra,* footnote 7, p. 489.
[12] *Roth v. United States, supra,* footnote 7, p. 487, footnote 20.
[13] *Alberts v. California* (1957), 354 U. S. 476, 77 Sup. Ct. 1304, 1 L. Ed. (2d) 1498.

entire context, and you are not to consider detached or separate portions in reaching a conclusion.' " (p. 490.) In *Alberts* the trial judge indicated that as the trier of facts, he was judging each item as a whole as it would affect the normal person.

The court also appeared to endorse the definition of the American Law Institute, Model Penal Code, sec. 207.10(2) (Tentative Draft No. 6, p. 1, 1957):

"A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, *i.e.,* a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters."

The court also said: "Obscene material is material which deals with sex in a manner appealing to prurient interest." [14]

There are several areas in which we, as well as others, have found the *Roth* test difficult to interpret. An excellent analysis of the *Roth* decision is contained in Censorship of Obscenity, an article by Dean Lockhart and Professor McClure of the University of Minnesota Law School. Those authors conclude that *Roth,*

". . . laid down two—and only two—constitutional requirements for determining what is obscene. The two requirements are, of course, that material must be judged as a whole, not by its parts, and that it must be judged by its impact on average persons, not the weak and susceptible." [15]

The authors point out other concepts which they believe may be developed in future decisions. Among other questions raised is whether and to what extent the category of the obscene will include material which is not "hard-core pornography." [15a] It has been suggested that four *per*

[14] *Roth v. United States, supra,* footnote 7, p. 487.
[15] 45 Minnesota Law Review (1960), 5, 53.
[15a] *Supra,* p. 74 ff., footnote 15.

*curiam* decisions of the supreme court of the United States following *Roth* make it "clear that the court was applying the constitutional guarantees of freedom of expression to confine obscenity censorship within very narrow limits indeed." [15b]

One portion of the *Roth* decision which has been the subject of controversy, and which is of importance in dealing with the case before us, is the extent to which the seriousness of an author's purpose, the social importance of the idea expressed, or the artistic quality of expression is to be weighed in determining whether a work is obscene under the test.

The court said:

"All ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. . . . We hold that obscenity is not within the area of constitutionally protected speech or press." [16]

Where a literary work of serious purpose which can reasonably be said to be a portrayal of truth or to express a social or philosophical idea is couched in language, or conveyed by the relation of incidents, of a type which would

[15b] *Supra,* p. 35, footnote 15. The decisions referred to are: *Times Film Corp. v. Chicago* (1957), 355 U. S. 35, 78 Sup. Ct. 115, 2 L. Ed. (2d) 72, *Mounce v. United States* (1957), 355 U. S. 180, 78 Sup. Ct. 267, 2 L. Ed. (2d) 187, *One, Inc., v. Olesen* (1958), 355 U. S. 371, 78 Sup. Ct. 364, 2 L. Ed. (2d) 352, and *Sunshine Book Co. v. Summerfield* (1958), 355 U. S. 372, 78 Sup. Ct. 365, 2 L. Ed. (2d) 352. Mr. Justice HARLAN takes notice of this theory in his opinion, joined in by Mr. Justice STEWART, in *Manual Enterprises, Inc., v. Day* (1962), 370 U. S. 478, 82 Sup. Ct. 1432, 8 L. Ed. (2d) 639.

[16] *Roth v. United States, supra,* pp. 484, 485, footnote 7.

be obscene in another context, do the guaranties protect it, or does the nature of the language and of the incidents of the plot permit its suppression? We do not understand the quoted language as meaning that particular material can be determined to be obscene without considering the purposes, ideas, or artistic quality of the work. We can only conclude that under the capsule statement of the *Roth* test, the question of whether the work is obscene is to be answered in the process of identifying the dominant theme and the degree of its appeal to the prurient interest. A balancing of factors is undoubtedly necessary in the application of the test, and we are of the opinion that where a work of apparent serious purpose is involved, the scales will not readily be tipped toward the determination of obscenity. Although we understand that a literary work of some quality was involved in the *Roth Case* we understand that its merits were not before the supreme court for procedural reasons.[17]

Sec. 269.565, Stats., contemplates such balancing of factors. It directs the taking of evidence as to literary, cultural, or educational character of the material under scrutiny, as well as providing that the dominant effect of the whole shall be determinative.

The supreme judicial court of Massachusetts, in holding Tropic of Cancer not obscene, expressed the balancing concept as follows:

"We think, in the light of the decisions reviewed above, that the First Amendment protects material which has value because of ideas, news, or artistic, literary, or scientific attributes. If the appeal of material (taken as a whole) to adults is not predominantly prurient, adults cannot be denied the material. When the public risks of suppressing ideas are weighed against the risks of permitting their circulation, the guaranties of the First Amendment must be

---

[17] Minnesota Law Review, *supra,* p. 22, footnote 15.

given controlling effect. The dangers of subjective judgments in the matter of censorship lead to a strong presupposition against suppression." [18]

### The Book, Tropic of Cancer.

The book, written by Henry Miller, was originally published in Paris in 1934. Grove Press published it in the United States in 1961, first in a hard cover (318 pages, priced at $7.50) and later in a paperback (288 pages, priced at 95 cents). The covers contain no pictorial or similar eye-catching material indicating that the book has spicy content. A Milwaukee distributor of paperbacked books had made the paperback edition available to its 580 dealers. A number of the dealers including supermarkets and most drugstores declined to stock this book. Some 2,400 were sold to stands at traffic points, department stores, large bookstores, a few drugstores, and smoke shops.

The book is autobiographical in form. It was the opinion of one of the expert witnesses that much of it is drawn from actual experience, although some of the characters were probably invented. It could be called a pseudonovel. Virtually all the witnesses agreed that the book demonstrates substantial ability to write.

The author is represented as an American living in Paris in the depression years about 1930. He considers himself an artist. He has little money and drifts from place to place in the city, sometimes performing service in return for a place to live, sometimes not, and holds a job for one or two periods. He is an iconoclast. He idealizes nothing, and sees life in its crudest terms. He seeks real meaning, but does not appear to find it.

He and those around him have frequent and casual sex experiences. The book contains many references to and

[18] *Attorney General v. Book Named "Tropic of Cancer"* (Mass. 1962), 184 N. E. (2d) 328, 333.

some descriptions of these episodes. A few of them involve perversions. Some involve prostitutes. Some of the participants are victims of venereal diseases and others are fearful of them. The book appears to be a truthful portrayal of experience, though unsavory. One of the dominant impressions from it is that lives oriented as those of its characters were empty of meaning or value.

Much of the language in the book would be offensive to many. References to the sexual episodes, to other bodily functions, and to women are made in short English words of ancient origin and wide, but not often printed, usage, classified by the dictionary [19] as vulgar or, in one or two instances, obscene.

But it seems a reasonable conclusion that the use of crude language contributed to the force with which the author expressed his ideas. Although some of these words would not be tolerated in our society if inflicted on unwilling listeners, an offended reader need only close the book in order to escape. [19a]

Although some of the passages in the book appeal to prurient interest, or excite lustful thoughts, to some degree, the overall impression, both from the episodes referred to and the language employed is one of surfeit. Considered as a whole, the book does not, in our judgment, appeal to prurient interest.

One of the expert witnesses thought the book was valuable as a piece of literature "because it purges the reader of prurient interests." One reviewer considered that reading the book may be "an emetic experience."

---

[19] Webster's New International Dictionary (3d ed., unabridged).

[19a] Before material can be held obscene it must be found both to appeal to prurient interest and to be patently offensive. These are not alternative tests. See opinion of Mr. Justice HARLAN in *Manual Enterprises, Inc., v. Day, supra,* footnote 15b.

### The Expert Testimony.

The witnesses differed on the ultimate issue of obscenity as well as on the subjects, referred to in sec. 269.565 (4), Stats., of the book's literary, cultural, or educational character. Appellant's experts included a professor of English at the University of Wisconsin—Madison, a professor of psychology at the University of Wisconsin—Milwaukee, an assistant professor of English at University of Wisconsin—Milwaukee, and the reference librarian at University of Wisconsin—Milwaukee. All considered that the book had some meaning or value, and although hard put to express the theme (as we also are), were of the opinion that the dominant theme did not appeal to prurient interests. The district attorney's experts included clergymen of three faiths, a man with professional experience in religious education, and a deputy probation officer. In their opinion the book did appeal to the prurient interests of the average man in Milwaukee, although one or more of them believed the book would have cultural or historical value for persons interested in those fields and having more than average education.

### The Critics.

It was shown that a number of reviews of Tropic of Cancer have been published in various newspapers and periodicals. Although the opinions differ, and were not expressed in terms of the *Roth* test, the evidence indicates that critics of recognized stature, writing in responsible publications, have considered the book as a work of some substance and importance.

### The Decision of the Circuit Court.

The only specific finding was stated in terms of the *Roth* test. In a memorandum decision, the court referred to the

great number of instances of use of vulgar terms, and the sexual episodes. He considered that some passages had merit, but that the bad dominates the good. He concluded · "that the book is repugnant to decency and the moral standards of the community, and has no literary, cultural, social or educational value in this area."

### The Proper Role of the Reviewing Court.

We have already referred to the provision of our statute which spells out the standard which a trial judge must apply in testing the sufficiency of a jury finding of obscenity: The finding must not be contrary to law or to the great weight and clear preponderance of the evidence. This is the standard normally applied by this court in reviewing, upon appeal, a finding made by a judge as the trier of fact, in the absence of a jury.

In *Roth,* the court's quotation, with apparent approval, of the trial court's instruction that the jurors were the exclusive judges of the conscience of the community,[20] and the reference to "the average person, applying contemporary community standards"[21] suggest that the supreme court of the United States might, within some limits, consider a jury finding of obscenity final, although the court did not spell out the formula it might apply to determine whether a jury finding would be adequately supported by the record.

In *Chobot* we followed the finding-not-against-the-evidence approach.[22]

There is a view that when the constitutional protection is claimed, the judge or appellate court must make an independent review of the material to determine whether it is

[20] *Roth v. United States, supra,* p. 490, footnote 7.

[21] *Roth v. United States, supra,* p. 489, footnote 7.

[22] *State v. Chobot, supra,* p. 116, footnote 6.

obscene, and the concept that obscenity is a fact issue has been criticized.[23]

That a judgment of obscenity is not a fact issue of the ordinary type is obvious. Issues of legal and constitutional interpretation dominate the process of determination. Upon the one hand is the desirability of according as much finality as is reasonable to decisions of the tribunal of first instance, and on the other the undesirability of a formula which puts the decision of one jury or one judge upon a difficult constitutional issue beyond the reach of reconsideration.

The supreme judicial court of Massachusetts has resolved this dilemma by reliance upon the rule that where the evidence is documentary, the appellate court is not bound by the inferences drawn therefrom by the trial court.[24] We have recognized a similar rule.[25]

Although there was more conflict in the expert testimony in this case than there appears to have been in the Massachusetts case, we deem the reading of the book to constitute the most weighty factor in the determination, and do not consider ourselves bound by the decision of the trial court, based on his reading of it.

We have great respect for the opinion of the learned trial court, as we have for the opinions of our brethren who agree with him. Nonetheless, it is our opinion that he gave too much weight to the author's use of vulgar language,

[23] Minnesota Law Review, *supra,* p. 114, footnote 15. See *People v. Richmond County News, Inc.* (1961), 9 N. Y. (2d) 578, 175 N. E. (2d) 681. See opinion of Mr. Justice HARLAN, concurred in by Mr. Justice STEWART, in *Manual Enterprises, Inc., v. Day, supra,* p. 488, footnote 15b.

[24] *Attorney General v. Book Named "Tropic of Cancer," supra,* p. 329, footnote 18.

[25] *Will of Mechler* (1944), 246 Wis. 45, 55, 16 N. W. (2d) 373, cited in *Vogt, Inc., v. International Brotherhood* (1955), 270 Wis. 315, 321j, 71 N. W. (2d) 359, 74 N. W. (2d) 749.

hereinbefore referred to, and to the fact that the incidents related violate our standards of acceptable conduct, and insufficient consideration to the fact that the book has commanded serious attention as a literary work of some importance.

*The Reference to "Community Standards."*

As previously noted, the *Roth* test seems to put the standard of obscenity in terms of the "average person, applying contemporary community standards." Plaintiff considers that the term "community" in the test refers to "an indistinct geographic area part of and attached to a metropolitan center" such as Milwaukee. Upon the trial he objected to an expression of opinion in terms of the *Roth* test by a professor of English who lives in a different community within the state.

The meaning of the reference to community standards in *Roth* has been questioned, and it has been suggested that the term has no reference to any locality, but rather to standards of society as a whole.[26] The resort to community standards seems more relevant to a determination of whether a book or other material is "patently offensive" than to a determination of whether it appeals to prurient interests.

We conclude that for the purposes of our statute, no distinction ought to be made between the standards of different communities within the state. We doubt whether standards which are relevant to the question of obscenity differ significantly from one locality to another in Wisconsin. Furthermore, our statute, sec. 269.565 (6), Stats., permits a judgment of obscenity to be used in a criminal trial of any person who was served with notice of it before the alleged violation. Under it a judgment obtained in

---

[26] Minnesota Law Review, *supra*, p. 110, footnote 15.

Milwaukee county could be so used anywhere in the state. Clearly this should not be so if the particular matter could be obscene in one area and not in another.

### Other Decisions on Tropic of Cancer.

We must acknowledge that courts have differed in their judgment of this book.

The supreme judicial court of Massachusetts (by a 4–3 decision, as is this one in our court) determined the book not obscene.[27]

The United States court of appeals, Ninth circuit, determined the book obscene, before, however, the enunciation of the *Roth* test, and employed a standard which appears somewhat different.[28] The appellate department of the California superior court has held the book obscene.[28a] The United States supreme court has agreed to review this decision.[28b]

We are informed that trial courts, in unreported cases, have held the book not obscene [29] and obscene.[30]

### Summary.

Tropic of Cancer has received the serious attention of critics as an important book,[31] though there is controversy

---

[27] *Attorney General v. Book Named "Tropic of Cancer," supra,* footnote 18.

[28] *Besig v. United States* (9th Cir. 1953), 208 Fed. (2d) 142.

[28a] *People v. Smith* (decided October 24, 1962), 31 Law Week 2227.

[28b] *Smith v. California* (April 29, 1963), 31 Law Week 3351.

[29] *Haiman v. Morris* (Illinois superior court, Cook county, decided February 26, 1962).

[30] *Connecticut v. Trumbull Huntington* (Supreme court, Hartford county); *Levine v. George Moreland* (Maryland, circuit court, Montgomery county); *Pennsylvania v. Grove Press, Inc.* (court of common pleas, Philadelphia county, decided April 17, 1962).

[31] We point out that the book now before us has different stature from the material as to which we sustained a finding of obscenity

as to its merit. It appears to be a truthful portrayal of an unsavory segment of life. The author has frequently used short vulgar words which are not often printed and which are offensive to many. The coarse language and the blunt descriptions of normal and abnormal sexual transactions can reasonably be thought to contribute to the effectiveness of the portrayal. Some of the episodes, taken alone, appeal to prurient interests, but, in our opinion, the dominant theme of the book, taken as a whole, does not.

Our reading of the book has engendered no enthusiasm. We do not endorse it. Our judgment will preserve its access to the market place where Wisconsin readers may buy it if they choose. In terms of the good that this particular book is likely to accomplish, we probably do no great thing in preserving it. Our function, however, is not to determine the quality of a book. Our duty is to respect and enforce in full measure the freedom of expression guaranteed by state and federal constitutions.

*By the Court.*—Judgment reversed, cause remanded with directions to dismiss the complaint.

BROWN, C. J. (*dissenting*). On competent evidence the circuit court, trier of the fact, found that the dominant theme of the whole book, "Tropic of Cancer," to the average person, applying contemporary community standards, appeals to prurient interests. This paraphrases the test approved by *Roth v. United States* (1957), 354 U. S. 476, 489, 77 Sup. Ct. 1304, 1 L. Ed. (2d) 1498, and which we adopted as the test by which to determine whether a publication is obscene in *State v. Chobot* (1960), 12 Wis. (2d) 110, 112, 106 N. W. (2d) 286, appeal dismissed, 368 U. S. 15, 82 Sup. Ct. 136, 7 L. Ed. (2d) 85, rehearing denied,

in *Chobot*. That material could be reasonably considered as approaching, if not within, the category of pornography, if defined as "daydream material calculated to feed the autoerotic desires of the immature or perverted." Footnote 15, *supra,* p. 62.

368 U. S. 936, 82 Sup. Ct. 358, 7 L. Ed. (2d) 198. While contrary evidence was given, the finding is not against the great weight and clear preponderance of the evidence. Accordingly, the finding should not be disturbed by the appellate court. If the finding is not disturbed the trial court's conclusion must follow—that the book is obscene and not entitled to the protection of the First amendment of the federal constitution nor that of sec. 3, art. I of the Wisconsin constitution.

The Wisconsin legislature has enacted sec. 269.565, Stats. Its part, presently material, commands:

"(5) *Findings and judgment.* If, after such hearing, the court, or jury (unless its finding is contrary to law or to the great weight and clear preponderance of the evidence), determines that such matter is obscene, the court shall enter judgment that such matter is obscene."

Having determined on competent evidence that Tropic of Cancer is obscene, the trial court correctly entered judgment embodying its conclusions relative to determination of obscenity and declaring that the protection of the free-press portions of the state and federal constitutions do not extend to Tropic of Cancer.

Whatever we may think, individually, of the public policy of suppressing any writing, as a court we may not declare our personal opposing preferences to be the law and thus subvert the public policy determined by the legislature. Thus it appears to me that the judgment of the trial court must be affirmed unless, of course, we can find that upon perusal of the book itself we find as a matter of law that Tropic of Cancer is not constitutionally obscene.

After judgment was entered in the circuit court but before the appeal was heard here, the case of *Manual Enterprises, Inc., v. Day* was determined by the United States supreme court ((1962), 370 U. S. 478, 486, 487, 82 Sup.

Ct. 1432, 8 L. Ed. (2d) 639). There the postmaster general barred certain magazines from the mails because they were obscene and because they informed persons where obscene materials could be obtained. This administrative ruling was sustained by the federal district court and the court of appeals. The supreme court reversed. Mr. Justice HARLAN wrote the principal opinion in which Mr. Justice STEWART joined. They held that the challenged material was not obscene under constitutional standards. Mr. Justice BLACK concurred in the result but gave no reasons. Mr. Justice FRANKFURTER and Mr. Justice WHITE did not participate. Mr. Justice BRENNAN, the chief justice, and Mr. Justice DOUGLAS concurred in the result on the ground that the postmaster general lacked authority to make the ruling complained of. Mr. Justice CLARK dissented. In his view the postmaster general does have the powers which he exercised and the record shows that the magazines inform the reader where obscene material can be found. That learned justice expressly refrained from considering the question of whether the magazines were themselves obscene. He would affirm the decision below.

It is apparent, therefore, that there was little agreement among the justices in the *Day Case* but in the principal opinion Messrs. Justices HARLAN and STEWART announced a rule amending the *Roth* test of obscenity. They said that in addition to the appeal to prurient interest, as in *Roth,* in order to be held obscene the questioned material must present a "patently offensive portrayal." Messrs. Justices HARLAN and STEWART may have been speaking only for themselves but no other justice voiced disagreement with their addition to the test set forth in the *Roth Case.*

Tested by *Roth* alone, the trial court's finding that Tropic of Cancer is obscene is conclusive, as I have said earlier. If we add to the test of obscenity the further requirement that there be present a patently offensive portrayal, which some

of the justices in *Day* considered a prerequisite for a finding that the material is obscene, I have no difficulty in finding that this element also is present in Tropic of Cancer as a matter of law.

In the recent Massachusetts case of *Attorney General v. Book Named "Tropic of Cancer"* (Mass. 1962), 184 N. E. (2d) 328, referred to in appellants' brief and in the majority opinion, the only evidence before the trial court and the appellate court was the book itself. It was proper there for the supreme judicial court of Massachusetts to act on the rule that where all the evidence is documentary the appellate court need not be influenced by the decision of the trial court but may reach its own conclusions from inspection of the documents. Appellants now urge us to pursue the same course. But the present case is different. This is not a case where we have documentary evidence alone. Now we have a great deal of expert testimony concerning contemporary community standards and the appeal to prurient interests in that area. We cannot ignore that testimony nor the findings based thereon.

If we care to consider that the test of the *Roth Case* has been amended by some of the justices who participated in the *Day Case* we might look at the book by itself to determine whether Tropic of Cancer is a patently offensive portrayal of the subject matter. If we do so it gives no aid and comfort to the appellants.

Far from being persuasive that the book is not obscene, a rereading of it only confirms the contrary conclusion. The book is a collection of anecdotes which, with few exceptions, describe in detail the sexual proclivities of a number of depraved men whose central character appears to be the author. His account of their practices and perversions in the erotic arena are described in the vilest terms known to the English language. The portrayal is patently offensive.

In *Attorney General v. Book Named "Tropic of Cancer,"* *supra,* a divided court, the supreme judicial court of Massachusetts, adjudged the book not constitutionally obscene. In dissent the court's learned chief justice and two of his colleagues aptly characterized the book thus (p. 336) :

"The book is pitched at the nadir of scatology. Indeed, its low level is relied upon as engulfing all obscene effect. We cannot bring ourselves to accept the thesis that the book, thus indicted, becomes endowed with constitutional protection. Its detailed and sordid sex episodes, persistently inserted at intervals in what passes for narrative, leave an outweighing staccato impression. In our opinion it should be classified as pornography."

I agree emphatically with the Massachusetts dissenters. Tropic of Cancer is saturated with filth in its substance and in its expression. The judgment should be affirmed.

I am authorized to say that Mr. Justice CURRIE and Mr. Justice HALLOWS join in this dissent.

HALLOWS, J. (*concurring in dissent*). I concur in the dissent written by Mr. Chief Justice BROWN and in addition emphasize my disagreement with several propositions espoused by the majority. The balancing concept and the "hard-core pornography" concept alluded to in the majority opinion read something into *Roth v. United States* (1957), 354 U. S. 476, 77 Sup. Ct. 1304, 1 L. Ed. (2d) 1498, which is not there. That decision is clear obscenity is not protected by the First amendment and the theory that purpose, ideas, and style are saving graces for obscenity is not espoused. Nor do I think any "balancing" is included in sec. 269.565, Stats. Purpose and literary quality are to be considered in determining the classification of a work but not in the balancing sense that some literary or social value or the subjective purpose of the author, or all three, are redeeming features which invoke the blessings of the constitution upon what is obscene in its dominant theme. It is

important to determine whether a book is a medical treatise on anatomy or a novel or other form of writing read for pleasure and enjoyment, but if the latter's dominant theme appeals to the prurient interest of the average man applying contemporary community standards, it is not saved by its literary style. Obscenity is only increased and heightened by being couched in literary artistry. Neither can obscenity have redeeming social importance. It is fallacious to argue what would be otherwise obscene is not obscene because it has social significance or some literary merit. The end (social significance or literary merit) does not justify the means (appeal to the prurient interest).

The concept of obscenity under sec. 269.565, Stats., or other state statutes may be more inclusive than the concept applied to federal statutes. It was pointed out in *Roth* that the "local moral fabric" which obscenity statutes protect is primarily and directly the responsibility and care of the states not of the federal government, and such powers of the federal government as exist in this field are only incidental to other powers such as the postal power.

Nor can I agree with the contention of the appellants that the *Roth Case* only includes "hard-core pornography" in the concept of obscenity. The majority opinion therein did not use the term. The dissenting opinion referred to it in connection with the limited power of the federal government. The respondent points out in his brief the difference between obscenity, pornography, and hard-core pornography is an extralegal mythical distinction hyperbolized by disseminators of obscene literature to undermine the effect of the *Roth* definition. All pornography is obscene. "Hard-core" can only mean a greater degree of obscenity, but can it be said that any pornography or obscenity is good? "Patently offensive" is another distinction of degree, not of nature. The less patent obscenity becomes, the more insidious the appeal to prurient interests. Our legislature in enacting

sec. 269.565, Stats., made no such distinctions but considered all obscenity bad and has also enacted sec. 944.22, which provides punishment by fine and imprisonment, or both, for the sale of obscene material.

Under the rules applicable to the scope of this court's power to review findings made by a trial court, the majority opinion must stand for the proposition that "Tropic of Cancer" is as a matter of law not obscene. The majority cannot reach that conclusion on the basis of a finding of fact in view of the record before us. Neither the facts nor the rule stated in the *Will of Mechler* (1944), 246 Wis. 45, 16 N. W. (2d) 373, cited by the majority is applicable. We are not confronted solely with inferences to be drawn from a written instrument. The rule of *State v. Chobot* (1960), 12 Wis. (2d) 110, 106 N. W. (2d) 286, applies. If the majority is correct, no need exists for the taking of any testimony of witnesses concerning the contemporary community standards of morality. While the majority accepts testimony of witnesses of social and literary value rejected by the trier of the fact, it draws its own judgment of obscenity from reading the book and ignores the greater weight of the testimony of the effect of the book judged by community standards. In this process it is not clear whether the majority considers the book is not obscene by any standards or whether the Milwaukee community standards of obscenity are so low that the book does not offend them.

In making its finding the book is not obscene, the majority has given no consideration to the respondent's witnesses. One was a manager of a major distributor of books in the Milwaukee area who determines and evaluates the reading habits of the people in Milwaukee from examining the type of books returned after being on display in the various outlets for a period of time. His annual sales ranged between 1,200,000 and 1,500,000. About 40 percent of the books on display are returned. He testified supermarkets and

drugstores were selective in what they displayed because they did not want books on their racks which would embarrass them in the eyes of their customers and none of the 170 supermarkets would accept Tropic of Cancer on their racks and 98 percent of the drugstores refused it. This certainly is of some importance and indication of what the contemporary community standard is. Also ignored was the testimony of a rabbi with twenty-four years' experience as a spiritual adviser, an educator and a holder of a Master's and Doctor's degree, an author and reviewer of books, and active in civic affairs. He testified that applying contemporary community standards the book appealed to the prurient interest of the average person in Milwaukee. Given no weight by the majority opinion was the testimony of a priest having a Master's degree in English literature, a student and a teacher of English literature, and a writer for monthly magazines. He also did counseling work relating to marital difficulties, alcoholism, youth, sex, and emotional problems. He testified the dominant theme of the book, applying contemporary community standards, appealed to the prurient interest of the average person and the book had no educational value or cultural value. Another witness, a teacher by profession, a possessor of a Bachelor's degree in Jewish education, a Bachelor of Science in education, a Master's and a Doctor's degree in education, and an author, testified that from his experience with all types of people, the book had no worthwhile purpose or educational value and was obscene, applying contemporary community standards. A probation officer with a Master's degree in social science, a former instructor in the social work at the University of Wisconsin and having eleven years' experience in the probation department, testified the book had no social value and the dominant theme was an appeal to the prurient interest of the average person.

He further testified the book tended to tear down and destroy generally accepted moral values as they existed. A Lutheran minister engaged extensively in counseling work, holding a Master's degree in education, and active on many civic committees, testified the dominant theme of the book appealed to the prurient interest of the average person in Milwaukee and the book would have deteriorating effect on the moral structure of the community.

In opposition to this, witnesses were produced by appellants, several of whom were primarily concerned with the intent of the author and not with the effect of the book upon the average person or society; another who used vulgar language in his family circle and who seemed to consider that prurience was something outside of an individual rather than an interest which exists within a person; and another who stated it was natural for persons of the same gender to have sex experience together and who disclaimed knowing the meaning of the word "normal" or "abnormal."

The majority opinion concludes upon reading the book the dominant theme does not appeal to prurient interest although it was "hard put to express the theme." The fact the Tropic of Cancer has received the attention of some critics and appears to be a truthful portrayal of an unsavory segment of life is considered a redeeming feature. Vulgar, unprintable words, which are offensive to many people, are justified and the blunt description of normal and abnormal sexual transactions are treated as contributing to the effectiveness of the portrayal. I think the majority gave too little consideration to contemporary community standards and to the duty of the state to protect the local moral fabric of its people through its police power in adopting sec. 269.565, Stats., and to the harm which the book will do to community morals. Freedom of speech we should and must have but it is not a right to be obscene. I would affirm.