COURT, Plaintiff in error, v. STATE, Defendant in error.

*No. State 36. (August Term, 1970), filed May 8, 1974.*
(Also reported in 217 N. W. 2d 676.)

For the plaintiff in error the cause was submitted on the briefs of *Fleishman, McDaniel, Brown & Weston* and *Stanley Fleishman,* all of Hollywood, California, and *Herrling, Hamilton & Swain* of Appleton, attorneys, and *Sam Rosenwein* of North Hollywood, California, of counsel.

For the defendant in error the cause was submitted on the brief of *Robert W. Warren,* attorney general, and *Thomas J. Balistreri,* assistant attorney general.

PER CURIAM.

*Appellate review.*

While *Miller v. California, supra,* and following cases expressly stated

". . . [t]he First Amendment values applicable to the States through the Fourteenth Amendment are adequately

protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary." *Id.* at page 25.

*Miller* failed to expressly state the nature and scope of such an independent review. As a result of this void in *Miller,* two theories have arisen as to the nature and scope of the independent review. One theory holds that the independent appellate review must be directed toward each of the three basic guidelines involved in the determination of obscenity. In support of this theory it is contended that the determination of obscenity involves factual matters entangled in a constitutional claim— constitutional facts. Appellate courts are required to exercise their independent judgment as to each element involved in a constitutional question. The other theory holds that an independent appellate review is limited solely to the issue of serious social expression. Under this theory the issues of prurient appeal and patent sexual offensiveness are questions of fact for the exclusive determination of the trier of fact subject to appellate review applying the usual substantial evidence test.

*Serious social value.*

It is the contention of the state that any independent appellate review must be limited solely to a determination of the social value of the works adjudged.

Any independent determination as to the issues of prurient appeal and patent sexual offensiveness—such being essentially questions of fact, *Miller* at page 27— would in our opinion constitute an unwarranted and illegal usurpation of that which is in the sole province of the jury.

In *Miller* the United States Supreme Court stressed the importance of the jury system in the determination of obscenity.

"In resolving the inevitably sensitive questions of fact and law, we must continue to rely on the jury system, . . ." *Miller* at page 26.

The fact that juries may reach contrary conclusions in the determination of obscenity requires no contrary result. Juries have historically determined questions of fact in murder, rape and a host of other crimes without a trial de novo of such issues by the judiciary. All that is required is that their determinations be supported by sufficient evidence. To require in obscenity questions an initial determination of factual issue and later a trial de novo upon those exact factual issues is without logic or jurisprudential precedent and in conflict with *Miller's* holding that individual juries may reach contrary results as to the same material.

It is argued by defendant in opposition of this theory of independent review that a determination of obscenity involves questions of constitutional fact and that judicial expertise is required in making determinations thereof. We fail to see the merit of this contention. What individual expertise do appellate judges have as to the prurient interest of the average man? Have appellate judges any special knowledge of patent offensiveness such that they can individually determine what affronts the sensibilities of the average man? The answer is undoubtedly no.

Rather, any special expertise that an individual judge may possess in an independent judicial review of the work alleged to be obscene is in the determination of serious social value. His determination of the presence *vel non* of serious literary, artistic, political or scientific value of work is grounded upon an individual expertise and is the sole criterion of constitutional protection to be applied by the judiciary.

We think the court in *Miller* intended the independent review to be limited solely to the third element of the test for obscenity because of the juxtaposition of the

requirement of independent review with the overruling of the utterly without redeeming social value test.

"We do not adopt as a constitutional standard the '*utterly* without redeeming social value' test of *Memoirs v. Massachusetts,* 383 U. S., at 419 [16 L. Ed. 2d 1 (1966)]; that concept has never commanded the adherence of more than three Justices at one time. See *supra,* at 21. If a state law that regulates obscene material is thus limited, as written or construed, the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary." *Miller* at page 24.

In fact, the only permissible inference that can be drawn from the juxtaposition described above is that the court in *Miller* intended the independent appellate trier of "serious social value" to replace that void previously served by the "utterly without redeeming social value" test—*i.e.,* the protection of serious social works from constitutional impairment.

The first amendment was originally promulgated only so as to protect the dissemination of significant issues of the time:

"The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully *all matters of public concern* without previous restraint or fear of subsequent punishment. The exigencies of the colonial period and the efforts to secure freedom from oppressive administration developed a broadened conception of these liberties as adequate to supply the public need for *information and education with respect to the significant issues of the times."* (Emphasis supplied.) *Thornhill v. Alabama* (1940), 310 U. S. 88, 101, 102, 60 Sup. Ct. 736, 84 L. Ed. 1093.

As such, only such material that attempts to disseminate serious social expressions is constitutionally pro-

tected. Material that constitutes libel, slander, fighting words or appeals to the prurient interests and is patently offensive has never been protected. *Roth v. United States* (1957), 354 U. S. 476, 77 Sup. Ct. 1304, 1 L. Ed. 2d 1498; *New York Times v. Sullivan* (1964), 376 U. S. 254, 84 Sup. Ct. 710, 11 L. Ed. 2d 686, 95 A. L. R. 2d 1412. Thus, the question for determination in each situation is whether the "quality" of the work is sufficient to require constitutional protection. That question—serious social expression *vel non*—is controlling and the only factor which the court must independently review in light of state proscription of material which treats "sex in a fundamentally offensive manner under rationally established criteria for judging such material." *Jacobellis v. Ohio* (1964), 378 U. S. 184, 204, 84 Sup. Ct. 1676, 12 L. Ed. 2d 793.

Finally, *Miller* states that what appeals to the "prurient interest" or is "patently offensive" are essentially questions of fact. This being so defendants have a constitutional right to a jury trial of these factual issues.

Only the last element of the obscenity formula is a conclusion, requiring the exercise of judgment, which is decisive of constitutional rights and only the issue of serious social value, therefore, may be determined independently by the appellate court.

*Community standards.*

The second issue for determination is whether community standards are to be expressed on a statewide or less than a statewide basis.

On appeal neither party contests the fact that the community standards to be applied are state standards. Several reasons for such a rare agreement between the state and the defendant exist. Initially it is contended that standards of less than statewide effect would be unworkable. Such is undoubtedly true. City, village or

town boundaries are unworkable since juries are drawn from the entire county and could not be expected to apply standards of a municipality in which they do not reside. Likewise, it is contended that since the court in *Miller* and *Kaplan v. California* (1973), 413 U. S. 115, 93 Sup. Ct. 2680, 37 L. Ed. 2d 492, accepted the use of statewide standards in California, such a scope of community standards has been jurisprudently required. This contention has merit.

The fact that statewide community standards constitutes the better rule has previously been accepted in Wisconsin—*McCauley v. Tropic of Cancer* (1963), 20 Wis. 2d 134, 121 N. W. 2d 545; *Court v. State, supra; State v. Kois* (1971), 51 Wis. 2d 668, 188 N. W. 2d 467 and in post-*Miller* decisions in foreign jurisdictions. *State v. J-R Distributors, Inc.* (1973), 82 Wash. 2d 584, 512 Pac. 2d 1049; *United States v. One Reel of Film* (1st Cir. 1973), 481 Fed. 2d 206.

We find merit in the contention that any criminal statute of less than statewide effect may not be promulgated by the legislature. Such would be the case if less than state standards were applied. Since obscenity and first amendment rights are matters of statewide concern, one community may not deem noncriminal that which is criminal in another community.

A compelling reason for rejecting any standard more localized than statewide is the impossibility of determining the boundaries of the local "community." It is nearly impossible to determine with precision the extent of a metropolitan area. Many such areas in this state extend beyond the boundaries of the larger central cities.

County standards would present a problem since some communities cut across county lines. The Appleton area where this case originated as well as the obvious example of Milwaukee are areas where portions of what clearly are recognizable as integrated local communities would

be governed by different standards. What would not be obscene on one side of the street might be obscene on the other.

We recognize that since *Miller* did not expressly limit community standards to a statewide approach and because of the following language in *Miller* at page 32:

> "It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City."

that inferentially standards of less than statewide effect may be permissible. However, drawing such an inference is too literal a reading of *Miller*. The above quote was nothing more than an attempt to accent the impossibility of nationwide standards as a controlling rule of law.

While there is precedent for the theory that less than statewide standards may be applied—*Brazelton v. State* (1973), 50 Ala. App. 723, 282 So. 2d 342; *Jenkins v. State* (1973), 230 Ga. 726, 199 S. E. 2d 183; *United States v. Groner* (5th Cir. 1973), 479 Fed. 2d 577, such precedent is not totally convincing. While each of the above-mentioned cases stands for the rule that the standard of the area from which the jury is drawn—*i.e.*, county or federal district—is to be applied, such an approach would be unworkable in specific areas. Juries for both circuit and county courts are drawn from the county venue —sec. 255.04, Stats. In so drawing juries, areas such as Appleton or Greater Milwaukee would have different standards of obscenity depending upon which side of the county line you are standing on. While juries naturally reflect the standards of their local community to carry such reflection to such a degree as requiring local community standards is of questionable merit. We think state standards should be applicable in obscenity cases.

We have independently reviewed the record in this case in the light of the mandate of the United States

Supreme Court and have determined that the material herein is without serious social expression. We conclude that the judgment of conviction and sentence must be affirmed.

The judgment of the circuit court for Outagamie county entered on October 29, 1969, adjudging the defendant guilty and imposing a fine of $500 plus costs or forty-five days in the county jail is reinstated and affirmed.

WILKIE, J. *(concurring)*. *Miller* makes it indelibly clear that an appellate court such as ours must conduct an independent review of the determination of obscenity as made upon the trial of an obscenity action. The question is what the precise scope of that review must be. Mr. Chief Justice HALLOWS has spelled out the detailed scope of that review in his separate opinion to *State ex rel. Chobot v. Circuit Court.*[1] I joined in that opinion to that extent and I would hold that the scope of our independent review, as controlled by the decisions of the United States Supreme Court, goes to each element involved in the determination of obscenity, to wit:

". . . (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest . . . (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."[2]

As stated in my concurring opinion in *Court v. State*,[3] "The determination of whether a particular publication is obscene is a mixed question of fact and constitutional

[1] (1973), 61 Wis. 2d 354, 372, 212 N. W. 2d 690.

[2] *Miller v. California* (1973), 413 U. S. 15, 24, 93 Sup. Ct. 2607, 37 L. Ed. 2d 419.

[3] (1971), 51 Wis. 2d 683, 711, 188 N. W. 2d 475.

law on which an appellate court is obliged to make an independent determination." The nature and scope of the independent judicial review has been discussed in the United States Supreme Court decisions of *Watts v. Indiana*,[4] *Jacobellis v. Ohio*,[5] and others. That type of review has been made by the United States Supreme Court recently as to a Wisconsin obscenity case in *Kois v. Wisconsin*.[6]

I, therefore, conclude that our independent review here must be to each element of the determination of obscenity. This is precisely the type of independent review that I made in connection with our original consideration of *Court*. On this remand I would affirm because of my independent examination of the publications, pursuant to which I have found the publications obscene. This finding, of course, would certainly continue under the revised and less strict definition of obscenity as now promulgated by the United States Supreme Court under *Miller*.

I have been authorized to state that Mr. Chief Justice HALLOWS joins in this concurrence.

ROBERT W. HANSEN, J. *(concurring)*. Is a jury to apply a statewide or local community standard in applying the "average person" test as to appeal to prurient interest in obscenity cases? For the answer we look to *Miller v. California*,[1] the first United States Supreme Court case since 1957 in which a majority of that court has agreed on the test to be used in determining what is

---

[4] (1949), 338 U. S. 49, 69 Sup. Ct. 1347, 93 L. Ed. 1801.

[5] (1964), 378 U. S. 184, 84 Sup. Ct. 1676, 12 L. Ed. 2d 793.

[6] (1972), 408 U. S. 229, 92 Sup. Ct. 2245, 33 L. Ed. 2d 312. *(State v. Kois* (1971), 51 Wis. 2d 668, 188 N. W. 2d 467; (1972), 55 Wis. 2d 512, 200 N. W. 2d 615.)

[1] *Miller v. California* (1973), 413 U. S. 15, 93 Sup. Ct. 2607, 37 L. Ed. 2d 419.

obscene.[2] The writer agrees with the court majority in this case that *Miller* permits the use of a statewide community standard. In *Miller,* the high court upheld a pornography conviction in a case where the trial judge instructed the jury on "statewide" standards.[3] However, the writer reads *Miller* as permitting the use of either a statewide standard or, alternatively, local community standards. In *Miller,* in text and footnotes, the majority opinion refers to "community standards" a dozen times,[4] mentions statewide standards twice.[5] If the high court had intended to mandate use of a statewide standard, it obviously could, certainly should, and, in the writer's opinion, certainly would have specified that a statewide, not a local, community standard was to be applied.

Moreover, the writer sees the rationale and reasoning of *Miller* as strongly suggesting the use of local community standards in the application of the "average person" test made part of its threefold formula for determining obscenity.[6] For three reasons, all derived from *Miller,* the writer would uphold the conviction in this

[2] *Id.* at page 22, the United States Supreme Court (majority opinion) noting: "Apart from the initial formulation in the *Roth* case, no majority of the Court has at any given time been able to agree on a standard to determine what constitutes obscene, pornographic material subject to regulation under the State's police power. . . ."

[3] *Id.* at pages 31, 32.

[4] *Id.* at pages 21, 24, 30, 33 and 37.

[5] *Id.* at pages 31, 33.

[6] *Id.* at page 24, the United States Supreme Court holding: "The basic guidelines for the trier of fact must be: (a) *whether 'the average person, applying contemporary community standards'* would find that the work, taken as a whole, appeals to the prurient interest [cases cited]; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. . . ." (Emphasis supplied.)

case but would adopt for the future the local community from which the jury is drawn as the geographical area whose average person's standards are to be applied. The three reasons are as follows:

(1) The prerequisite consensus among average persons in varied and various communities in this state as to what offends community standards is lacking. To locate a statewide consensus or standard appears to the writer to be as difficult and unrewarding an endeavor as has been the effort to locate and apply a nationwide standard. In *Miller,* the high court stated that ". . . our nation is simply too big and too diverse for this Court to reasonably expect that such standards could be articulated for all 50 States in a single formulation, even assuming the prerequisite consensus exists. . . ." [7] Individual states are not as big as the nation, but they can be as diverse. Who would deny that the average person, applying community standards in a Rice Lake or Lake Mills, might well find prurient and patently offensive materials and performances tolerated and found tolerable in a capital city of Madison? The higher court in *Miller* observed that: "People in different States vary in their tastes and attitudes . . . ." [8] As obviously, so do the average persons in the various counties or communities of this state. To adopt the community standard of the area from which the jury is drawn would be to recognize it as unreasonable to expect that a uniform statewide standard could be articulated for all counties or communities in the state in a single formulation, in part because the "prerequisite consensus" does not exist.

(2) The attempt to locate and apply a single statewide standard as to what average persons consider prurient or patently offensive can end up only with an approximation as to some median or halfway point between the most permissive and the least permissive com-

[7] *Id.* at page 30.
[8] *Id.* at page 33.

munity in the state. In *Miller*, the high court firmly stated, ". . . When triers of fact are asked to decide whether 'the average person, applying contemporary community standards' would consider certain materials 'prurient,' it would be unrealistic to require that the answer be based on some abstract formulation. . . ." [9] That is exactly what is asked of juries when they are asked to locate and apply a statewide standard. In *Miller*, the high court held a national standard as to what average persons consider prurient and offensive to be both "hypothetical and unascertainable." [10] As hypothetical and as unascertainable is a statewide community standard in this state. To start a search for a midway point between the various community standards in this state appears to the writer to be as difficult and unrewarding as has been the effort to structure obscenity proceedings around evidence of an equally hypothetical and unascertainable national standard. [11]

(3) The use of local community standards is inbuilt in the mandated test of an "average person, applying contemporary community standards." In *Miller*, in making clear where the trier of fact is to look for guidance in applying such "average person" test, the court stated: ". . . The adversary system, with lay jurors as the usual ultimate factfinders in criminal prosecutions, has historically permitted triers of fact *to draw on the standards of their community,* guided always by limiting instructions on the law. . . ." [12] (Emphasis supplied.)

---

[9] *Id.* at page 30.

[10] *Id.* at page 31, the United States Supreme Court (majority opinion) stating: ". . . Nothing in the First Amendment requires that a jury must consider hypothetical and unascertainable 'national standards' when attempting to determine whether certain materials are obscene as a matter of fact. . . ."

[11] *Id.* at page 30, the United States Supreme Court (majority opinion) stating: ". . . To require a State to structure obscenity proceedings around evidence of a *national* 'community standard' would be an exercise in futility."

[12] *Id.* at page 30.

Like the jurors themselves, the average person at the community level knows and has helped to formulate the standards of the community in which he lives. However, it is not realistic to expect such juror or average person in one Wisconsin community to know much about contemporary standards in a community at the other end of the state or much about what average persons in all communities in the state consider obscene. The geographical areas from which juries are drawn vary greatly in size, economic base and cultural life-styles. No juror needs help in determining and applying the standards of the average persons whom he meets daily, but there is no way for each juror to visit barbershops, beauty parlors, stores and shopping centers in other communities to determine what average persons there consider prurient or offensive. In *Miller,* the high court informs us that, ". . . In resolving the inevitably sensitive questions of fact and law, we must continue to rely on the jury system . . . ." [13] The writer submits that we can do that most effectively by using for the "average persons" test the contemporary community standards of the geographical area from which a jury in an obscenity case has been drawn or selected.

The writer joins the court majority in the case before us in upholding the conviction of the defendant, following a trial in which the statewide community standard was used. As to future prosecutions in obscenity cases, the writer would find the language of *Miller* as permitting and the logic of *Miller* as strongly suggesting the applicability of local community standards, and would adopt the geographical area from which a jury was drawn as the basis for determining whether the "average person, applying contemporary community standards," would find that the work or materials, taken as a whole, appeals to the prurient interest.

[13] *Id.* at page 26.