PLOTKIN, Judge.
Appellants, Jay LeBlang and his partially-owned corporation, Wonderful World of Video, seek reversal of their convictions by a jury under Louisiana’s obscenity statutes for the rental of adult videocassettes to police officers.
*603 Appellants were charged with three counts of violating LSA-R.S. 14:106, relative to obscenity, for distribution of the movies “Sex Boat,” “Irresistible” and “Behind the Green Door,” which were rented or sold to undercover New Orleans Police officers on different occasions.
In 1982, LeBlang had entered an agreement with the district attorney’s office, promising that he would refrain from dealing in obscene materials in return for the district attorney’s promise not to prosecute him for the rental of “Sex Boat,” the first of the three movies distributed. When he subsequently sold “Irresistible” and “Behind the Green Door,” he was prosecuted on all three counts.
The jury found the defendants not guilty on Count I, relative to “Sex Boat,” and guilty on Counts II and III, relative to “Irresistible” and “Behind the Green Door,” respectively. LeBlang was sentenced to one year at hard labor for each count, sentences to run concurrently. The sentences were suspended and he was placed on two years inactive probation with the condition that he pay $2,000 on each count plus court costs, or serve thirty days in default. Wonderful World of Video was fined $2,000 on each count and ordered to pay court costs. We reverse.
Appellants specified three assignments of error, all dealing with jury instructions. They are:
1. The trial judge erred in restricting the jury to consideration of the “contemporary community standards” in Orleans Parish. (Emphasis added.)
2. The trial judge erred by including the word “lustful” in the definition of “prurient interests.”
3. The trial court erred in refusing to give a special jury instruction that the agreement between the defendants and the district attorney is not evidence of the law of obscenity or of whether defendants violated the law.
LIMITATION OF COMMUNITY
La.R.S. 14:106, relative to obscenity, provides, in pertinent part, as follows:
Obscene material is any tangible work or thing which the trier of fact determines (a) that the average person applying contemporary community standards would find, taken as a whole, appeals to the prurient interest, (b) depicts or describes in a patently offensive way, hard core sexual conduct specifically defined in Paragraph (2) above, and (c) the work or thing taken as a whole lacks serious literary, artistic, political, or scientific value. (Emphasis added.)

Proper Definition of Community

The jury instructions in the instant case included the following statement, made on the State’s request and over the defendant’s objection:
In determining whether the magazine [sic] appeals to the prurient interest and is presented in a patently offensive way, you must apply the contemporary community standards for the Parish of Orleans. In assessing those community standards you are permitted to draw upon your knowledge of the community from which you come. You, the jury, are the sole judges of the contemporary community standards of New Orleans, just as you are the judges of all questions of fact. In making this determination, you are not to consider your own personal opinion of what is good, bad, desirable, or undesirable. You are not to condemn by your own standards if you believe them to be stricter than those generally held, nor are you to exculpate or excuse by your own standards if you believe them to be more tolerant than those that are generally held. In determining the contemporary community standard you should not confine yourself to your own neighborhood, but to the — but to consider the entire Parish of Orleans. (Emphasis added.)
The above statement, which begins erroneously by referring to magazines, constituted the entire instruction concerning the applicable “contemporary community standards.”
The “contemporary community standards” test for judging obscenity was ap *604 proved by the United States Supreme Court in Roth v. United States, 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957). The three-part test reflected in the Louisiana statute quoted above, which includes the “contemporary community standards” prong, was developed sixteen years later in Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973).
Although the United States Supreme Court made no attempts to define the relevant “community” in the Roth decision, the argument that uniform national standards must be applied was rejected in Miller, supra, 413 U.S. at 31, 93 S.Ct. at 2619. The court concluded that “neither the State’s alleged failure to offer evidence of ‘national standards,’ nor the trial court’s charge that the jury consider state community standards, were constitutional errors.” Id.
The next year, the Court again considered the question in two separate opinions. Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) and Jenkins v. Georgia, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974). In Hamling, supra, the Court summarized the holdings of Miller and its progeny, saying they allow “a juror sitting in obscenity cases to draw on knowledge of the community or vicinage from which he comes.” Id. 418 U.S. at 105, 94 S.Ct. at 2901. In Jenkins, supra, the Court approved jury instructions directing the application of “contemporary community standards” without specifying the relevant “community,” stating that “the Constitution does not require that juries be instructed in state obscenity cases to apply the standards of a hypothetical statewide [sic] community.” Id. at 157, 94 S.Ct. at 2753. The choice of whether to define an obscenity offense using precise geographic terms or to leave the relevant community unspecified was specifically left to the States. Id.
On the basis of this holding, the appellants argue that the judge’s instructions in the instant case improperly usurped the legislature’s power to select the relevant community. The Louisiana Revised Statute defining obscenity, quoted above, leaves the relevant community unspecified. Therefore, the appellants contend, the trial court improperly restricted the jury’s deliberations.
The argument has merit. Although no Louisiana court has spoken definitively concerning whether the jury instructions in obsenity cases can define the relevant community in terms of parish or other less than statewide standards, Louisiana Supreme Court jurisprudence argues against such instructions. In upholding the Louisiana obscenity statute against a challenge that it was Constitutionally vague for failure to define community standards, the court stated in State v. Amato, 343 So.2d 698 (La.1977) as follows:
Furthermore, in Miller and the cases following it the United States Supreme Court has made it clear that a state may choose to define an obscenity offense in terms of “contemporary community standards” without further specification, as Louisiana has done, thus permitting juries to rely on the understanding of the community from which they come as to contemporary community standards; or a state may choose to define the standards in more precise geographical terms, as has been done in other jurisdictions.
The court indicated that the jury should be permitted to rely on the understanding of the community from which they come as to contemporary community standards. Limiting the community in the manner indicated in the jury instruction in the instant case is therefore improper.
The bulk of other state and federal courts which have spoken on this issue agree with this interpretation. Citing Miller, supra and Hamling, supra, the United States Eighth Circuit Court of Appeals stated in United States v. McManus, 535 F.2d 460 (8th Cir.1976), cert, denied, 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977) that “one of the constitutional standards used to determine obscenity is local rather than national in character.” Id. at 464. See also, State v. Wein, 162 NJ.Super. 159, 392 A.2d 607 (Ct.App.Div.1978), *605 rev’d on other grounds, 80 N.J. 491, 404 A.2d 302 (1979).
Other state courts have gone even further, holding that anything less than a state-wide standard, such as the parish standard employed by the trial court in this case, is improper. Especially pertinent is the language of the Supreme Court of Wisconsin in Court v. State, 63 Wis.2d 570, 217 N.W.2d 676 (1974), which stated that “[cjounty standards would present a problem since some communities cut across county lines.” Id. at 577, 217 N.W.2d at 679. Use of a county standard, the court stated, would result in
“areas where portions of what clearly are recognizable as integrated local communities would be governed by different standards. What would not be obscene on one side of the street might be obscene on the other.”
This is precisely the problem with applying parish standards in the New Orleans metropolitan area.
Alabama’s Supreme Court agrees with the Supreme Court of Wisconsin, as revealed by the following quote:
Alabama would be faced with many problems in determining the exact scope of a community if it were smaller than the state as a whole. On first impulse, one would think that the county would be an appropriate geographical unit for establishing standards because one assumes a natural relationship between the county and the jury vicinage. However, this assumption is not always accurate, for in Alabama, there are a number of counties that have judicial divisions separating geographical areas in a county with separate courthouses for each such area.
Pierce v. State, 292 Ala. 473, 480, 296 So.2d 218, 224 (1974), cert, denied sub nom, Bai-lete v. Alabama, 419 U.S. 1130, 95 S.Ct. 816, 42 L.Ed.2d 830 (1975). Although the problem is just the opposite in New Orleans, where the same metropolitan area includes areas in a number of different parishes, the conclusion, that a county standard would be unworkable, applies.
In addition to the above, the highest court in the State of New York, the Court of Appeal, has determined that the statewide standard is applicable. See, State v. P. J. Video, Inc., 68 N.Y.2d 296, 508 N.Y.S. 2d 907, 501 N.E.2d 556 (N.Y.Ct.App.1986), cert, denied, 479 U.S. 1091, 107 S.Ct. 1301, 94 L.Ed.2d 156 (1987). The court stated that the factfinder is required to “determine the average New Yorker’s evaluation of, and reaction to, the challenged material.” Id. at 309, 508 N.Y.S. at 915, 501 N.E.2d at 564.
The Supreme Court of Colorado has taken the issue a step further and held that use of anything less than a state-wide standard would be unconstitutional. In People v. Tabron, 190 Colo. 161, 544 P.2d 380 (1976), the court cited the U.S. Constitution, Amendment I, and stated that imposition of “less than a state-wide standard in the interpretation of a state statute would be to denigrate the constitutional guarantees that are afforded to every person.” Id. at 163, 544 P.2d at 381. The following quote from the Court decision, supra, indicates that the Wisconsin Supreme Court agrees:
We find merit in the contention that any criminal statute of less than statewide effect may not be promulgated by the legislature. Such would be the case if less than state standards were applied. Since obscenity and First Amendment rights are matters of state-wide concern, one community may not deem noncriminal that which is criminal in another community.
63 Wis.2d at 577, 217 N.W.2d at 679.
Although it has never held that a statewide standard is required, Texas courts have held that jury instructions limiting the relevant community to a specific county constitute automatic reversible error. Brewer v. State, 659 S.W.2d 441 (Tex.Crim. App.1983); Larue v. State, 637 S.W.2d 934 (Tex.Crim.App.1982). Additionally, courts in a number of states have upheld jury instructions which left the relevant community unspecified. See, State v. Johnson, 104 N.M. 430, 722 P.2d 681 (App.1986), cert, denied, 104 N.M. 378, 721 P.2d 1309 *606 (1986); People v. Wiseman, 129 Mich.App. 258, 341 N.W.2d 494 (1983).
The United States District Court for the Northern District of Illinois has said that judges may limit the community to “the Chicago metropolitan area” but to no smaller area like the “City of Chicago.” United States v. Various Articles of Merchandise, Seizure No. 187, 625 F.Supp. 861, 865 (N.D.I11.1986). Courts “should consider, at least, the Chicago metropolitan area in its determination due to the ease of transportation and the large amount of interaction between the residents of the City of Chicago and residents of the surrounding communities,” the court stated. Id.
That conclusion is applicable to the case at hand. The trial judge in the instant case told the jury to consider the contemporary community standards of “the Parish of Orleans,” “New Orleans” and “Orleans Parish.” Since the parish and the city are identical in this case, all three characterizations of the relevant community are too limited. Most likely, absent the jury instruction, jurors in Orleans Parish would not consider their community as consisting only of Orleans Parish but would consider the community as consisting of a greater area than just that contained within the parish boundaries. The Greater New Orleans area, socially and economically, is a thoroughly-integrated metropolis extending across parish lines. For a large portion of its citizens, the parish lines are nothing more than meaningless governmental jurisdictional boundaries which are crossed in both directions as the citizen leads his daily life — sleeping in one parish, working in another. Thus, it is quite conceivable, if not probable, that when a juror in Orleans Parish is called upon to determine the standards of the community in which he lives, his vision of the community is broader than the confines of the parish. The jury’s right to make such determinations under the letter of Louisiana’s obscenity statute should not have been limited by the judge’s instructions.

Prejudicial Nature of Instruction

Whether the appellants’ convictions should be reversed because of this improper jury instruction depends on whether the instruction was prejudicial. The Supreme Court has held that “reversal is required only where there is a probability that the excision of the ...[improper] instruction dealing with community standards would have materially affected the deliberations of the jury.” Hamling, supra, 418 U.S. at 108, 94 S.Ct. at 2903. In order to determine the probability that the instruction materially affected the deliberations of the jury, we must look at the instruction in light of the purpose of the “contemporary community standards” test, which has been described by the Louisiana Supreme Court as follows:
to emphasis the need for an external standard, as compared with the trier of fact’s personal views of decency, and to prevent the evaluation of obscenity being based on whether the material had an adverse effect on any particularly susceptible subclass of the community.
State v. Wrestle Inc., 360 So.2d 831, 834 (La.1978), rev’d in part on other grounds sub nom, Burch v. Louisiana, 441 U.S. 130, 99 S.Ct. 1623, 60 L.Ed.2d 96 (1979), citing Roth, supra, 354 U.S. at 488-91, 77 S.Ct. at 1310-12.
Since jury instructions are to be judged as a whole, not by picking isolated phrases from them, Hamling, supra, 418 U.S. at 107, 94 S.Ct. at 2902, several courts have upheld convictions based on improper jury instructions concerning the definition of the relevant community where the above principles were enunciated clearly. See U.S. v. Cutting, 538 F.2d 835 (9th Cir. 1976), cert, denied, 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977); Richards v. State, 461 N.E.2d 744 (Ind.App.3d Dist. 1984).
In the instant case, a review of the totality of the jury charge concerning community standards reveals that rather than emphasizing that the jurors should consider the proper “external standard,” the judge emphasized the fact that the jurors should consider only the community standards of Orleans Parish. The fact that Orleans Parish was the community to be considered was repeated three times in the instruction. *607 The purpose of the community standards test, to insure that a cross-section of ideas and philosophies are considered in evaluating whether a given work is obscene, was not communicated to the jurors. Although the judge did inform the jurors that they should consider more than their own personal opinions, he made no references to particularly susceptible or particularly liberal persons in the community, as required by the caselaw.
Unquestionably the best jury instruction in this case would have left the community unspecified and allowed the jury to determine the relevant community. We acknowledge that the improper limitation of the community would not require reversal if the instruction had otherwise contained the necessary elements to communicate the purpose of the standard. Had the judge properly instructed the jury in a manner which would have communicated to the jury that the purpose of the test is to assure that a generalized, “external” standard was applied, reversal of the conviction on the basis of this assignment of error would have been unnecessary. However, the instruction given was confusing. The emphasis placed on the fact that Orleans Parish was the relevant community, coupled with the trial testimony concerning availability of adult videos in Jefferson Parish, communicated to the jury that “contemporary community standards” were probably different in the two parishes. Such a message is improper and undoubtedly had a material effect on jury deliberations. In this case, we conclude that the probability that the jury deliberations were materially affected was present, making reversal necessary.
INCLUSION OF “LUSTFUL” IN DEFINITION OF “PRURIENT INTEREST”
In their second assignment of error, appellants challenge the use of the word “lustful” in the definition of “prurient interest.” La.R.S. 14:106 is silent concerning the proper definition of “prurient interest,” leaving interpretation of the term to trial courts. The trial judge in the instant case made the following statement during his jury instructions: “The term prurient interest denotes a shameful, morbid, or lustful interest in sex, nudity, or excretion.” (Emphasis added.) This was his entire instruction regarding the definition of “prurient interest.”
It is well settled in United States Supreme Court jurisprudence that obscenity laws should not be “read to include ... those materials that appeal to only normal sexual appetites.” Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 496, 105 S.Ct. 2794, 2798, 86 L.Ed.2d 394 (1985). The reason for this rule is simple: Since obscenity is not considered entitled to First Amendment' protection, it must be strictly delineated to include only those materials which fit the definition, because sexually-oriented matter which is not obscene is fully protected by the constitution. Ama-to, supra, 343 So.2d at 704. “It is only when the sexually oriented matter fulfills all of the requirements of the definition of obscenity set forth in the Miller decision that it may be proscribed by law.” Id. “The line between protected expression and punishable obscenity must be drawn at the limits of a community’s tolerance rather than in accordance with the dangerous standards of propriety and taste.” Red Bluff Drive-In, Inc. v. Vance, 648 F.2d 1020, 1029 (5th Cir.1981), cert, denied sub nom, Theatres West Inc. v. Holmes, 455 U.S. 913, 102 S.Ct. 1264, 71 L.Ed.2d 453 (1982).
Appellants argue that the inclusion of the word “lustful” in the definition of “prurient interests” allowed the jury to convict if the films distributed appealed only to a normal, healthy interest in sex. There is merit in that position, based not just on inclusion of the word “lustful” in the instruction, but also on the fact that the instruction, read in its entirety, did not adequately inform the jury that only an abnormal, unhealthy interest in sex is equivalent to a “prurient interest.” This holding is supported by recent federal case law.
Although the word “lustful” appears in the footnote of the landmark Roth decision, *608 a federal appeals court disapproved use of the word in J-R Distributors, Inc. v. Eik-enberry, 725 F.2d 482 (9th Cir.1984), rev’d on other grounds, Brockett, supra, because the meaning of the word had changed since the Roth decision was written in 1957. Id. at 490. In its subsequent reversal of the Ninth Circuit’s decision in that case that Washington’s obscenity statute was unconstitutional, the United States Supreme Court deferred to the lower court's interpretation of that issue. Brock-ett v. Spokane Arcades, Inc., 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985).
Mississippi’s obscenity was rendered unconstitutionally overbroad by use of the word “lustful” for the grounds stated above in Goldstein v. Attain, 568 F.Supp. 1377 (Miss.N.D.1983). That statute defined “prurient interest” as “a lustful, erotic, shameful, or morbid interest in nudity, sex or excretion.” Id. at 1380. The court found that this definition did not properly limit the definition “to prevent intrusion on arguably protected areas of speech.” Id. at 1385.
The most recent federal case to address this issue was Polykoffv. Collins, 816 F.2d 1326 (9th Cir.1987). In that case, the court pretermitted the question of whether use of the word “lustful”, alone, would render a statute or instruction improper. The court held that instructions which included the word “lustful” could be acceptable, where they “repeatedly exclude normal, wholesome, healthy sexual desires from the scope of ‘prurient interest.’ ” Id. at 1336. In that decision, the court was referring to the following instruction, upheld in State v. Bartanen, 121 Ariz. 454, 591 P.2d 546 (1979), cert, denied, 444 U.S. 884,100 S.Ct. 174, 62 L.Ed.2d 113 (1977):
“The term appeal to the prurient interest means to excite lustful thoughts, a shameful or morbid interest in sex or nudity, arouse sexual desires or sexually impure thoughts, included to or disposed to lewdness, having lustful ideas or desires.
[[Image here]]
“A prurient interest in sex is not the same as a candid, wholesome, or healthy interest in sex. Material does not appeal to the prurient interest just because it deals with sex or shows nude bodies. Prurient interest is an unhealthy, unwholesome, morbid, degrading or shameful interest in sex, a leering or longing interest. An appeal to the prurient interest is an appeal to sexual desire, not an appeal to sexual interest. An interest in sex is normal, but if the material appeals to an abnormal interest in sex, it can appeal to the prurient interest.”
Id. at 458, 591 P.2d at 550. The Polykoff, supra, concluded that inclusion of the word “lustful” in the above instruction did not, by itself, require reversal of the conviction. That decision was based upon the finding that the instruction, taken as a whole, properly excluded all non-obscene sexually-oriented material.
However, the jury instruction given by the judge in the instant case did not properly limit the definition of “prurient interest” to exclude all non-obscene sexually-oriented material. We find that the instruction might have allowed the jury to convict the appellants for distribution of materials entitled to First Amendment protection. By defining “prurient interest” as a “shameful, morbid, or lustful” interest, the judge failed to communicate that materials can be obscene only if they appeal to an abnormal, unhealthy, shameful or morbid interest in sex, nudity or excretion. The judge’s definition of “prurient interests” failed to draw the line between obscene and non-obscene material at “the limits of the community’s tolerance,” and instead improperly allowed the jury to consider the “dangerous standards of propriety and taste.” Red Bluff Drive-In, supra, 648 F.2d at 1029. Since the trial judge failed to take the proper precautions to assure that the jurors did not convict the appellants for distributing material entitled to First Amendment protection, the convictions must be reversed.
USE OF THE DIVERSION AGREEMENT

Background Facts

LeBlang was among several Orleans Parish video store owners arrested in *609 1982 on charges of violating Louisiana’s obscenity laws. His arrest occurred when he rented the movie, “Sex Boat” to a member of the New Orleans Police Department’s vice squad. Neither LeBlang nor any of the other owners were prosecuted in 1982 because they signed “diversion agreements” with the district attorney’s office, which provided as follows:
On the date shown, the above named company and/or its agents/employees were charged by N.O.P.D. with violating L.R.S. 14:106 (obscenity).
Through negotiations between the undersigned Assistant District Attorneys and legal counsel for the above named company and/or its owners, stockholders, agents or employees, the following agreement is entered into regarding the disposition of the above charges.
The above named company, its owners, stockholders, agents or employees, hereby agrees not to offer, publicize, print, manufacture, prepare, or advertise for sale, allocation, consignment, distribution, dissimination [sic], advertisement, exhibition, or display any material or item which constitutes a violation of L.R. S. 14:106 in the future, within the boundaries of Orleans Parish. By entering this agreement, no guilt is admitted.
The New Orleans District Attorney’s Office agrees that in return for this commitment, the charges brought against the above named company, its owners, stockholders, agents or employees, on the date and under the N.O.P.D. item number shown above will be dismissed.
It is further agreed that if the above named company engages in any activity which constitutes a violation of L.R.S. 14:106 hereafter, and the violation occurs within the prescriptive period of the above violation of L.R.S. 14:106, the charges listed above can be filed against the company at the discretion of the New Orleans District Attorney’s Office.
LeBlang was subsequently arrested after he sold the films “Irresistible” and “Behind the Green Door” to other members of the New Orleans Police Department vice squad. Under the terms of the above agreement, LeBlang and Wonderful World of Video were each then charged with three counts of violation of LSA-R.S. 14:106.
At trial in the matter, the jury first learned of the existence of the diversion agreement during defense counsel’s questioning of police officer David Skevington, who rented “Sex Boat” from the defendants. Subsequently, the prosecution sought to use the agreement both to prove that LeBlang had distributed obscene materials and to prove that LeBlang was not “a man of his word.”
When he signed the diversion agreement, LeBlang agreed not to deal in any material “which constitutes a violation of L.R.S. 14:106.” He did not agree to refrain from selling or distributing any specific named films nor to refrain from dealing in “adult films.” “Sex and obscenity are not synonymous,” according to the United States Supreme Court in Roth, supra, 354 U.S. at 487, 77 S.Ct. at 1310. (Emphasis added.) Additionally, the mere representations fitting the described activities in the obscenity statute, standing alone, do not necessarily' constitute obscenity or unprotected speech. Amato, supra, 343 So.2d at 703. He could break the agreement only if he distributed films which were obscene, a determination that must be made by the finder of fact. The ultimate question for the jury was whether the films rented and sold by LeBlang and Wonderful World of Video were in fact obscene.
Nevertheless, the prosecution attempted on numerous occasions during the trial to elicit the opinion of witnesses concerning whether the agreement had been broken. Each time, the prosecutor incorrectly intimated that LeBlang agreed not to deal in any adult films when he signed the agreement and that he had admitted his guilt. The following exchange occurred during redirect questioning of Officer Skevington:
EXAMINATION BY MR. BOSHEA:
Q. Do you have any knowledge of any sorts of agreements involving Jay LeBlang?
A. Yes, Mr. LeBlang entered into a similar agreement with the district at *610 torney’s office as did all the other stores.
Q. And do you have any knowledge as to whether or not he continued to follow that agreement?
BY MR. REED:
Your Honor, that’s the question that the jury has to decide, whether anybody has violated the law in this case. That calls for a conclusion.
[[Image here]]
BY THE COURT:
He can — he can answer the question. EXAMINATION BY MR. BOSHEA:
Q. To your knowledge, did Mr. Le-Blang follow the terms of the agreement?
A. No, he did not.
Q. Do you know whether his agreement was any different from the agreement made with the other video stores regarding the sale of these kind of materials?
A. I believe all the agreements were the same.
Q. And do you, to your knowledge, know of any other video store that violated the agreement other than Mr. LeBlang?
A. No, sir.
Trial transcript, pages 63-65.
Later, during cross examination of Linda LeBlang, LeBlang’s wife and part owner of Wonderful World of Video, the prosecution again asked for an opinion concerning whether the agreement had been broken. Mrs. LeBlang testified as follows:
Q. But after he signed the agreement you decided to go ahead and sell tapes anyway, right?
A. Yes.
Q. Okay. He broke the agreement and said I am going to sign — I am going to sell adult tapes.
Trial transcript, page 227. (Emphasis added.)
Of course, Mrs. LeBlang had not testified that defendants “broke the agreement,” only that they continued to rent and/or sell adult tapes. The agreement did not prohibit the distribution of adult tapes per se, only the sale or distribution of material “which constitutes a violation of L.R.S. 14:106.” Therefore, the assistant district attorney’s comment was inappropriate and misleading. Only the jury had the right to decide whether the tapes in question were obscene. Nonetheless, the prosecution again made that statement later in Mrs. LeBlang’s cross examination, when he asked:
Q. And you changed the way you did business about the same time he broke the agreement with the district attorney, didn’t you?
BY MR. REED:
Objection, calls for a conclusion as to whether the agreement with the district attorney has been broken.
EXAMINATION BY MR. BOSHEA:
Q. When you decided to go ahead and re-sell tapes after he signed an agreement not to sell ?
BY MR. REED:
Objection, Your Honor, there has been a conclusion whether that agreement says that a — he was not to sell tapes. I have got the agreement, the district attorney has got the agreement, if he’s going to testify to it he should put it in evidence.
[[Image here]]
EXAMINATION BY MR. BOSHEA:
Q. About the time Jay decided to break the agreement with the district attorney, that’s about the same time you all changed the way you did business, isn’t that a fact?
BY MR. REED:
I object in so far as the question assumes a conclusion that there had been a decision to break an agreement.
BY THE COURT:
Unless the witness knows of such a decision, the objection is sustained.
Trial transcript, pages 231-32. (Emphasis added.)
Later in the trial, the prosecution again made improper reference to the agreement during his re-cross examination of Mrs. Le-Blang, by asking as follows:
*611 Q. But the money was made, you needed the money so you went ahead, broke the agreement and re-sold the tapes, didn’t you?
BY MR. REED:
Objection as to breaking the agreement, Your Honor, that calls for a conclusion that’s beyond—
Trial transcript, pages 243-44. (Emphasis added.)
The prosecutor also attempted to get Le-Blang himself to admit that he sold obscene films after signing the agreement. On cross-examination, he asked:
Q. You intentionally broke the agreement, didn’t you?
A. No, I have never broken the agreement.
Trial transcript, page 267. (Emphasis added.)
The assistant district attorney made a final improper reference to the diversion agreement in his closing agreement when he attempted to rebut LeBlang’s character evidence by saying:
Now he talks about these people who all came in. Now, they are all friends of his.... And what did they tell you? He’s a man of his word. He is well liked in his community. No problem with his neighbors, they obviously didn’t know him, in fact, because he’s not always a man of his word. He didn’t think much of the contract, he didn’t think much of breaking the agreement, so that’s not true_ Mr. LeBlang testified that he was aware that films of this nature have been subject to previous obscenity prosecutions. He is aware of all that, yet he went ahead and sold them anyway.
Supplemental Trial Transcript, pages 30-31. (Emphasis added).

Request for Special Jury Charge

The defense requested the following special jury instruction to offset the implications made by the prosecution in the above statements:
An agreement entered into by a district attorney and a citizen to avoid a prosecution is legal as between the district attorney and the citizen. Such an agreement is not evidence as to what the law of obscenity is, nor as to whether the defendant has broken the laws on obscenity, and you are specifically directed not to consider the agreement as such.
The trial judge denied the request and refused to give the above instruction. La.C.Cr.P. art. 807 provides as follows:
The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
(Emphasis added.)
The Louisiana Supreme Court has held that, if the defendant requests such a charge, a trial judge is required by the above provision to charge the jury as to the law applicable to any theory of defense which a jury could reasonably infer from the evidence. State v. Johnson, 438 So.2d 1091, 1097 (La.1983). La. C.Cr.P. art. 802 requires the trial judge to “charge the jury as to the law applicable to the case.” The Supreme Court has interpreted that provision to require that the trial judge charge the jury concerning every phase of the case arguably supported by the evidence, even if the judge does not believe it. State v. Mead, 377 So.2d 79, 82 (La.1979).
The requested jury charge is “wholly correct and pertinent” to the case at hand. The State does not contest its validity or pertinence. Additionally, although the State claims inclusion of the charge would have required “extensive explanation,” no argument was made to bolster that contention. Since we can see no merit in that assertion, we find that the requested *612 charge did not require any qualification, limitation or explanation. Finally, the requested charge was not included in any of the other charges given the jury. Therefore, the trial judge was in error in refusing to give the special instruction. Prejudice to Defendants’ Substantial Rights
The Louisiana Supreme Court has held that the refusal to give a requested special jury charge does not warrant reversal of a defendant’s conviction unless it prejudices substantial rights of the accused. State v. Marse, 365 So.2d 1319, 1324 (La 1978), La.C.Cr.P. art. 921. However, reversal is proper in this case because substantial rights of the defendants were prejudiced by the prosecution’s improper use of the diversion agreement.
The defendant was first prejudiced when the trial court allowed New Orleans Police Officer Skevington to give what was essentially opinion testimony concerning whether the defendants had violated the diversion agreement. By stating that LeBlang had violated the agreement, Skevington stated his opinion that the two movies sold by defendants subsequent to the agreement were obscene.
In a similar case, State v. Wheeler, 416 So.2d 78 (La.1982), the Louisiana Supreme Court reversed the conviction of a defendant because the trial judge allowed a police officer to testify that, in his opinion, the defendant had been involved in the distribution of marijuana. The ⅛-ourt stated as follows:
This testimony was tantamount to an opinion that the defendant was guilty of the crime charged, an indirect, abstract inference as to the ultimate issue in the case. The officer was no more an expert than the jurors concerning the matters at issue in this case....
Id. at 81.
In the instant case, Officer Skevington was no more an expert concerning whether the subject films were obscene than the jury and should not have been permitted to make an “indirect, abstract inference as to the ultimate issue in the case.” Id. In Wheeler, the court found that the improper admission of such testimony was so prejudicial as to require reversal, despite “abundant [other] evidence of the defendant’s guilt.” Id. at 82. In the instant case, there is no other evidence of the defendant’s guilt — if the films were not obscene, the defendant had broken no laws. Therefore, the prejudicial effect of the police officer’s testimony is even more erroneous here.
Even in the absence of the police officer’s opinion testimony, the improper use of the diversion agreement in the instant case so prejudiced the defendants’ substantial rights as to require reversal because the prosecution sought to use the agreement to show the defendants’ knowledge that they were “doing something wrong.” During closing arguments, the prosecution stated:
Now he talks about the agreement and I think the agreement is relative [sic] for a couple of things. One is it shows knowledge, he knew that he was doing something wrong, that’s why he signed the agreement.
Supplemental Trial Transcript, page 29,
The United States Fifth Circuit Court of Appeals reversed a conviction for mail fraud violations in connection with the sale of interests in oil and gas drilling ventures based on the improper use of a consent injunction in United States v. Cook, 557 F.2d 1149 (5th Cir.1977), cert, denied sub nom, Jackson v. United States, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 767 (1978). In that case, the defendants had consented to the entry of injunctions prohibiting violations of specific securities laws in settlement of a civil action filed by the Securities Exchange Commission two years prior to the trial. At trial, the government sought to use the injunctions as proof that the defendants were aware of “official disapproval” of their past conduct. Id. at 1152. In reversing the conviction, the Fifth Circuit noted that the improper use of the injunction was unfairly prejudicial because of the “improper suggestion ... that the fraudulent acts listed in those documents had been committed by [defendants] who *613 consented to the orders.1 court stated: Id. at 1153. The
The danger of unfair prejudice is even more pronounced here, where the evidence is so strongly suggestive of other wrongs, and yet the injunctions were obtained by compromise, with the defendants neither admitting nor denying any wrongdoing.
Id. at 1154.
One of the convictions was reversed in Cook, supra, despite the fact the trial court gave cautionary instructions because “[e]ven the best instruction may be insufficient” and “a limiting instruction is particularly likely to be ineffective against prejudicial evidence of the type herein.” Id.
In the instant case, not only did the prosecution make improper use of the same type of evidence disapproved in Cook, but the trial judge refused to even give a limiting instruction. As demonstrated by the above excerpts from the transcript, the prosecution sought on numerous occasions to use the diversion agreement signed by LeBlang as evidence not only of knowledge of guilt, not also of the fact of guilt. In reality, it was neither. The agreement was signed by LeBlang in an effort to compromise with the district attorney's office. He neither admitted nor denied any jvrongdo-ing. Its improper use at trial resulted in prejudice to the defendants’ substantial rights, requiring reversal of the convictions.
The prejudicial effect on the jury in this case is clear from the verdict returned. The defendants were acquitted on Charge I relative to “Sex Boat,” but convicted on Charges II and III, relative to “Irresistible” and “Behind the Green Door.” This court has reviewed the films and finds no substantial difference in the content of “Sex Boat” and “Irresistible.” In fact, if anything, “Sex Boat” is probably the more objectionable of the two because, in addition to the same types of sexual activity portrayed in “Irresistible”, “Sex Boat” shows a woman tied to a tree in one scene and contains another scene where women are forced into having sex by pirates. The only explanation for the inconsistency of the jury verdicts is the belief of the jury that after the initial arrest and the signing of the diversion agreement, LeBlang was aware that he was doing “something wrong.” That is an improper basis for the conviction.
REVERSIBLE ERROR
The most recent United States Supreme Court case to address the issue of whether improper jury charges constitute reversible error is Pope v. Illinois, 481 U.S. 497, 107 S.Ct. 1918, 1921, 95 L.Ed.2d 439 (1987). In that case, the Supreme Court held that
in the absence of error that renders a trial fundamentally unfair ... a conviction should be affirmed “where a reviewing court can find that the record developed at trial established guilt beyond a reasonable doubt....”
Id. 107 S.Ct. at 1922, citing Rose v. Clark, 478 U.S. 570,106 S.Ct. 3101, 92 L.Ed.2d 460 (1986).
In the instant case, we are unable to find that the record developed at trial established guilt beyond a reasonable doubt. Therefore, for that reason, as well as the other reasons stated above, the appellants’ convictions under Louisiana’s obscenity law are reversed.
REVERSED.
BARRY and CIACCIO, JJ., concur with reasons.
BARRY, Judge, concurs with reasons.
The State’s use of the diversion agreement was improper and pre-convicted the defendant.
I would pretermit the other specifications.